No. 17-16760

UNITED STATES CIRCUIT COURT OF APPEALS
FOR THE NINTH CIRCUIT

CENTER FOR BIOLOGICAL DIVERSITY, a non-profit organization; and
EARTH ISLAND INSTITUTE, a non-profit organization,

*Plaintiffs and Appellants*

*vs.*

ELI ILANO, in his official capacity as Supervisor of the Tahoe National Forest,
THOMAS TIDWELL, Chief of the United States Forest Service, and the U.S.
FOREST SERVICE,

*Defendants and Appellees,*

*and*

SIERRA PACIFIC INDUSTRIES, a California Corporation,

*Defendant-Intervenor and Appellee-Intervenor*

APPEAL FROM DENIAL OF MOTION FOR SUMMARY JUDGMENT

By the United States District Court, Eastern District of California
Honorable Vince Chhabria, U.S. District Court Judge

**APPELLANTS' OPENING BRIEF**

Justin Augustine (CA #235561)
1212 Broadway, Suite 800
Oakland, CA 94612
(503) 910-9214
jaugustine@biologicaldiversity.org

René P. Voss
15 Alderney Road
San Anselmo, CA 94960
(415) 446-9027
renepvoss@gmail.com

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure 26.1, Plaintiffs Center for Biological Diversity and Earth Island Institute state that they are non-profit entities that have not issued shares to the public and have no affiliates, parent companies, or subsidiaries issuing shares to the public.

Respectfully submitted this 5th day of January, 2018,

*/s/ Justin Augustine*

_____

Justin Augustine
René P. Voss

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION..........................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........................1

STATEMENT OF ADDENDUM ..........................................................3

STATEMENT OF THE CASE...............................................................3

SUMMARY OF THE ARGUMENT ....................................................12

ARGUMENT .................................................................................16

    A.  STANDARD OF REVIEW................................................................16

    B.  DEFENDANTS VIOLATED NEPA BY FAILING TO CONDUCT ANY NEPA ANALYSIS WHEN DESIGNATING 5.3 MILLION ACRES OF NATIONAL FOREST IN CALIFORNIA AS "TREATMENT AREAS" PURSUANT TO 16 U.S.C. § 6591A(B)(2).................................................................................17

       1. The Forest Service's White Paper Violates Ninth Circuit Precedent ........19

       2. The Statute Contains No Express Exemption From NEPA, And The Ninth Circuit's Limited Exceptions To The General Rule That NEPA Applies Are Not Present Here .................................................................33

          a.  There Is No Irreconcilable Conflict..................................................35

          b.  NEPA's Requirements Have Not Been Displaced...........................39

    C.  THE FOREST SERVICE'S RELIANCE ON A "CATEGORICAL EXCLUSION" VIOLATES NEPA BECAUSE "EXTRAORDINARY CIRCUMSTANCES" EXIST WHICH PRECLUDE THE USE OF A CATEGORICAL EXCLUSION ......................45

    D.  EFFECTIVE RELIEF IS STILL AVAILABLE ........................................52

CONCLUSION ..............................................................................54

STATEMENT OF RELATED CASE ....................................................55

# TABLE OF AUTHORITIES

## Cases

*Bennett v. Spear*,

520 U.S. 154 (1997) ......................................................................... 25

*Blue Mountains Biodiversity Project v. Blackwood*,

161 F.3d 1208 (9th Cir. 1998) ..................................................... 12, 16

*California v. Block*,

690 F.2d 753 (9th Cir. 1982) ............................................................ 29

*California Wilderness Coal. v. U.S. Dep't of Energy*,

631 F.3d 1072 (9th Cir. 2011) ................................................... passim

*Cascadia Wildlands v. BIA*,

801 F.3d 1105 (9th Cir. 2015) .......................................................... 12

*Conner v. Burford*,

848 F.3d 1441 (9th Cir. 1988) .......................................................... 33

*Dep't of Transp. v. Pub. Citizen*,

541 U.S. 752 (2004) ..................................................... 24, 20, 31, 32

*Douglas Cty. v. Babbitt*,

48 F.3d 1495 (9th Cir. 1995) .................................................. 39, 40, 41

*Drakes Bay Oyster Co. v. Jewell*,

729 F.3d 967 (9th Cir. 2013) ........................................................... 39

*Earth Island Inst. v. U.S. Forest Serv.*,

    442 F.3d 1147 (9th Cir. 2006) ............................................................ 53

*Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Oklahoma*,

    426 U.S. 776 (1976) ...................................................... 35, 36, 37, 39

*Friends of the Clearwater v. Dombeck*,

    222 F.3d 552 (9th Cir. 2000) ............................................................ 10

*Friends of Yosemite Valley v. Norton*,

    348 F.3d 789 (9th Cir. 2003) ...................................................... 22, 28

*Gardner v. U.S. Bureau of Land Mgmt.*,

    638 F.3d 1217 (9th Cir. 2011) .......................................................... 16

*Greenpeace Action v. Franklin*,

    14 F.3d 1324 (9th Cir. 1992) ............................................................ 52

*Jones v. Gordon*,

    792 F.2d 821 (9th Cir. 1986) ...................................................... 35, 36, 37, 38

*League of Wilderness Defenders/Blue Mountains Biodiversity Project v.*

    *Connaughton.*,

    752 F.3d 755 (9th Cir. 2014) ............................................................ 16

*Marsh v. Oregon Natural Resources Council*,

    490 U.S. 360 (1989) .......................................................................... 17

*Merrell v. Thomas*,

   807 F.2d 776  (9th Cir. 1986) ........................................................... 39, 42, 44, 45

*Neighbors of Cuddy Mountain v. Alexander*,

   303 F.3d 1059 (9th Cir. 2002) .............................................................. 53

*N. Alaska Envtl. Ctr v. Kempthorne*,

   457 F.3d 969 (9th Cir. 2006) ................................................................ 22

*Northcoast Environmental Center v. Glickman*,

   136 F.3d 660 (9th Cir. 1988) ................................................................ 30

*Northwest Envtl. Def. Ctr. v. Gordon*,

   849 F.2d 1241 (9th Cir. 1988) .............................................................. 52

*Oregon Natural Desert Ass'n v. BLM*,

   531 F.3d 1114 (9th Cir. 2008) .............................................................. 22

*Robertson v. Methow Valley Citizens Council*,

   490 U.S. 332 (1989) ........................................................................... 10

*San Luis & Delta-Mendota Water Auth. v. Jewell*,

   747 F.3d 581 (9th Cir. 2014) ........................................................ passim

*Southwest Ctr. for Biological Diversity v. United States Forest Serv.*,

   100 F.3d 1443 (9th Cir. 1996) ....................................................... 47, 51

*Winter v. NRDC*,

   555 U.S. 7 (2008) ............................................................................... 53

**Statutes**

5 U.S.C. § 706 ................................................................................. 16, 17

15 U.S.C. § 793 ..................................................................................... 34

16 U.S.C. § 824p ................................................................................... 23

16 U.S.C. § 1536 ................................................................................... 43

16 U.S.C. § 6501 ........................................................................... 3, 35, 39

16 U.S.C. § 6514 ................................................... 3, 4, 14, 24, 35, 43, 45

16 U.S.C. § 6516 ................................................................................ 3, 24

16 U.S.C. § 6591a. .......................................................................... passim

16 U.S.C. § 6591b. .......................................................................... passim

28 U.S.C. § 1291. ..................................................................................... 1

28 U.S.C. § 1331. ..................................................................................... 1

28 U.S.C. § 1346. ..................................................................................... 1

28 U.S.C. § 2201. ..................................................................................... 1

28 U.S.C. § 2202. ..................................................................................... 1

**Regulations**

36 C.F.R. § 220.6 ............................................... 2, 5, 15, 46, 47, 49, 50

40 C.F.R. § 1502.20 ............................................................................. 25

40 C.F.R. § 1508.4 ........................................................................... 5, 46

40 C.F.R. § 1508.8 ............................................................ 29

40 C.F.R. § 1508.18 ....................................................... 21, 26

## STATEMENT OF JURISDICTION

Jurisdiction existed in the District Court pursuant to 28 U.S.C. §§ 1331 (federal question), 2201 (injunctive relief), 2202 (declaratory relief), and 28 U.S.C. § 1346 (United States as a defendant), and the claims arose under the National Environmental Policy Act (NEPA) and the Administrative Procedure Act (APA). The District Court's denial of Plaintiffs' motion for summary judgment is an appealable final decision as it disposed of all the issues in the case, and this Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291. Judgment was entered on August 16, 2017, (Excerpts of Record (ER) 14), and the notice of appeal was filed on August 30, 2107 (ER 13). The appeal was timely pursuant to Federal Rules of Appellate Procedure 4(a)(1).

Plaintiffs have standing pursuant to their declaration filed with the District Court, which the District Court acknowledged in its Summary Judgment Order (at Footnote 2). ER 3.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. 16 U.S.C. § 6591a(b)(2) states: "**Designation of treatment areas** . . . (2) **Additional areas**[:] After the end of the 60-day period described in paragraph (1), the Secretary may designate additional landscape-scale areas under this section as needed to address insect or disease threats." In California, millions of acres of public forest were designated as "treatment areas" pursuant to 16 U.S.C. §

1

6591a(b)(2), but without conducting any National Environmental Policy Act (NEPA) analysis of the impacts of this designation decision. Did the Chief of the U.S. Forest Service violate NEPA when, pursuant to 16 U.S.C. § 6591a(b)(2), he designated "additional landscape-scale [treatment] areas" as part of an insect and disease treatment program without conducting any NEPA analysis?

2.    16 U.S.C. § 6591b allows some Forest Service projects that are conducted in section 6591a treatment areas to be "considered an action categorically excluded from the requirements of [NEPA] . . . ." Under NEPA, federal agencies may forego conducting an Environmental Impact Statement (EIS) or Environmental Assessment (EA) for proposed actions so long as there are no "extraordinary circumstances" present with respect to the action at issue. 36 C.F.R. § 220.6(a). In this case, the presence of a "sensitive species," the California spotted owl, triggered the need for an "extraordinary circumstances" analysis. 36 C.F.R. § 220.6(b)(1)(i). The Forest Service concluded that "extraordinary circumstances" do not exist, and therefore proceeded under a Categorical Exclusion instead of an EA. Did the Forest Service violate NEPA when it relied on a Categorical Exclusion to approve the Sunny South Project, even though the Sunny South Project will degrade occupied California spotted owl habitat?

## STATEMENT OF ADDENDUM

Pursuant to Ninth Circuit Rule 28-2.7, pertinent statutory and regulatory

provisions are set forth in an addendum attached to this brief as Attachment A.

## STATEMENT OF THE CASE

16 U.S.C. § 6591a and 16 U.S.C. § 6591b were created in 2014, as part of

the overall 2014 Farm Bill. ER 99, 105-108. 16 U.S.C. § 6591a, titled,

"Designation of treatment areas," provides the Chief of the Forest Service[1] with

mechanisms for designating "landscape-scale areas" to address tree mortality from

insects or disease in national forests. 16 U.S.C. § 6591a(b). To be designated as a

"treatment area," the forestland in question must meet one of three requirements

listed at 16 U.S.C. § 6591a(c). In these designated treatment areas, the Forest

Service can "carry out priority projects . . . to reduce the risk or extent of, or

increase the resilience to, insect or disease infestation in the areas." 16 U.S.C. §

6591a(d)(1). Such projects "shall be considered authorized hazardous fuel

reduction projects," and are subject to sections 6512, 6514, 6515, and 6516 of the

Healthy Forest Restoration Act (HFRA [16 U.S.C. § 6501 et seq.]). 16 U.S.C. §

6591a(d)(3). Section 6514 notes: "Except as otherwise provided in this

subchapter, the Secretary shall conduct authorized hazardous fuel reduction

projects in accordance with—(1) the National Environmental Policy Act of 1969

---

[1] The statute speaks to the Secretary of Agriculture, but the Secretary has delegated such duties to the Chief of the Forest Service. ER 109-110.

3

[42 U.S.C. 4321 et seq.] . . . ." 16 U.S.C. § 6514(a)(1). Section 6514(b) also

explicitly mandates an EA or EIS for the projects, but requires the EA or EIS to

only consider a limited number of alternatives as discussed in section 6514(c), (d).

In November of 2015, the Chief of the Forest Service, in response to a

request from the Forest Service's Regional Forester in California, formally

designated 5.3 million acres in California as insect/disease "treatment areas." ER

96, 99. The decision was issued, however, without conducting any NEPA analysis.

Instead, in a white paper in the record, the Chief asserts he can ignore NEPA in

this situation. ER 123-24. For example, the white paper argues that NEPA is

inapplicable because "[t]here are no effects that can be meaningfully evaluated.

The designation of areas does not create environmental disturbances (i.e., direct

effects). Nor does designation create indirect effects." ER 124.

Shortly after the designation of the treatment area acres, the Sunny South

Project was initiated in March 2016 (ER 80), and it was approved in August of

2016. ER 15, 41. The Project allows approximately 2,700 acres of logging to

occur on public lands within the Tahoe National Forest in California. ER 17, 21.

Because the Project occurs in a designated treatment area, it was approved

pursuant to 16 U.S.C. § 6591b. ER 37. Specifically, the Project was "considered

an action categorically excluded" from the normal NEPA process under 16 U.S.C.

§ 6591b(a)(1), and was deemed to meet the requirements of section 6591b(b)-(f).

4

ER 37-38. Consequently, neither an Environmental Assessment ("EA") nor Environmental Impact Statement ("EIS") was conducted for the Project. When assessing a "categorically excluded" (CE) project, however, the Forest Service must determine whether any "extraordinary circumstances" exist. 40 C.F.R. § 1508.4; 36 C.F.R. § 220.6. In this case, the presence of a "sensitive species," the California spotted owl, triggered the need for an analysis of "extraordinary circumstances" (36 C.F.R. § 220.6(b)(1)(i)), and the Forest Service was therefore required to examine the "cause-effect relationship" between the Sunny South Project and California spotted owls, and "the degree of the potential effect" to determine whether extraordinary circumstances exist. 36 C.F.R. § 220.6(b)(2). As part of the "extraordinary circumstances" analysis, the Forest Service must assess if "it is uncertain whether the proposed action may have a significant effect on the environment." 36 C.F.R. § 220.6(c). If so, then the Forest Service must at least "prepare an EA." *Id*. Here, the Forest Service concluded that "extraordinary circumstances" do not exist as to the Sunny South Project even though the Project degrades important spotted owl habitat. ER 31-32.

California spotted owls are considered a "sensitive species" due to their vulnerability.[2] ER 60, 59. Unfortunately, that vulnerability has only grown worse

---

[2] Moreover, the U.S. Fish and Wildlife Service recently found that an Endangered Species Act (ESA) listing petition for the California spotted owl presented substantial scientific information indicating that listing as a threatened or

recently on national forest lands—the population of spotted owls in the vicinity of the Sunny South Project dropped by 50% between 1990 and 2012. ER 62, 64.

As a result of their "sensitive species" status, California spotted owls in the Sierra Region have had portions of their habitat identified and mapped, which are referred to as Protected Activity Centers, or "PACs", and Home Range Core Areas, or "HRCAs." ER 93, 94. PACs encompass a very small 300 acre area within which the owls' nesting tree is located. ER 93. HRCAs are designed to provide additional acreage of high quality habitat: "HRCAs are delineated to include the best available 1,000 acres of nesting, roosting, and foraging habitat . . . . The HRCA outside the PACs also includes most of the other owl detections, such as roosts or foraging areas." ER 66, 68. Spotted owls use additional acreage outside of their designated PACs/HRCAs, but the PACs/HRCAs represent their most important habitat because it generally represents the highest quality habitat in the area. ER 66.

As part of the Sunny South Project, the Forest Service authorized logging in five occupied spotted owl "Home Range Core Areas" ("HRCAs", or "Core Areas"). ER 70 (stating that "all the territories that would be directly affected a[re] consistently occupied and frequently breed, contributing substantially to productivity"). The fact that these five owl Core Areas are occupied is itself of

---

endangered species may be warranted. 80 Fed. Reg. 56423, 56426 (Sept. 18, 2015). Their review will be completed in 2019.

great importance in light of the ongoing population decline. But these five Core Areas are of even more importance because the owls that live there are "currently or historically reproductive." ER 70 (Table 8). This reproductive success is critically valuable because it helps to counter what is otherwise occurring overall in the local owl population—a steep decline by 50% in recent years. ER 62. In short, the owls in these five unlogged Core Areas are helping to maintain what is otherwise an owl population heading towards extinction. This is why Plaintiffs brought this case—any negative impact to these owls from the Sunny South Project can be of great consequence not just to these owls, but to the overall owl population as well.

The Sunny South Project authorizes logging of 1,174 acres in the owls' Core Areas. ER 72 (Table 9). Published scientific research has examined the impacts that logging can cause to California spotted owls. Specifically, Tempel et al. 2014 (ER 125-142) found that the amount of mature forest with high canopy cover (70–100%) is one of the most critical variables for California spotted owl viability, and determined that "medium-intensity" logging—such as the commercial thinning style of logging at issue in this case—adversely affects California spotted owls by targeting dense, mature forests with high canopy cover and degrading the quality of such habitat by reducing it to moderate canopy cover. *See* Tempel et al. 2014 at ER 125 ("analyses indicated that the amount of forest

7

with high canopy cover [>70%] was the primary driver of population growth"), ER 137 ("The amount of forest with high (>70%) canopy cover dominated by medium- or large-sized trees was the most important predictor of variation in demographic rates.").

This degradation of canopy cover is likely to lead to one of three negative outcomes for the owls: death, displacement, or lost reproductive capacity. As explained in Tempel et al. 2014 (ER 125, 139): "Reproduction was negatively associated with the area of medium-intensity timber harvests . . . . [W]e believe that the most appropriate inference about the influence of medium-intensity harvesting practices is that they appear to reduce reproductive potential, and when implemented in forests with high canopy cover, are likely to reduce survival and territory occupancy[3] as well."

The Sunny South Project's logging of owl Core Areas will reduce canopy cover from well above 70%, to just 50%. ER 72, 73. Table 9 (at ER 72) in the record shows that 41%, 2%, 21%, 35%, and 76% of the five impacted Core Areas will be logged, and Defendants themselves acknowledge: "As shown in Table 9, only 14 acres (2%) of HRCA would be treated in PAC PLA0023, whereas substantial portions of the other HRCAs would be affected, particularly in

---

[3] When a territory loses occupancy, that means the owl (or owl pair), though it may not have died, has been displaced and has left the territory because the territory was no longer able to support it.

PLA0116, which includes 76% of the HRCA." ER 72. The Forest Service further admits that "[t]hese [HRCA] treatments would reduce habitat suitability by reducing canopy cover to a minimum of 50 percent . . . ." ER 31.

Despite the vulnerable status of spotted owls, the Forest Service proceeded to approve the Sunny South Project by using a Categorical Exclusion instead of preparing an EIS or an EA under NEPA. As a result, Plaintiffs, the public, and others agencies were unable to review, comment on, or rebut the Forest Service's analysis and conclusions. For example, while the Forest Service issued supporting documents with respect to the Decision Memo it used to justify the Categorical Exclusion, those supporting documents (e.g., ER 57-79) were never made available for public comment, and instead were only made public after the Decision Memo was issued. Furthermore, the scoping letter provided to the public, which is the only document the public had the opportunity to comment on, does not mention California spotted owls, and thus contains no information about them, or analysis of impacts whatsoever to them resulting from the Project. *See* ER 81-90. Consequently, there was never an opportunity for the public to comment meaningfully about the Project's impacts to owls or the Forest Service's analysis of such impacts.

In September of 2016, Plaintiffs Center for Biological Diversity and Earth Island Institute filed suit in district court. ER 145. Plaintiffs challenge the U.S.

9

Forest Service's failure to conduct any NEPA analysis at all with respect to the designation of treatment areas, and believe that Ninth Circuit precedent directly contradicts the assertions made by the Forest Service. Plaintiffs also challenge the U.S. Forest Service's conclusion that no "extraordinary circumstances" exist as to the Sunny South Project. Plaintiffs believe that the administrative record shows the potential for serious harm from the Project to California spotted owls and that therefore the Forest Service was required to complete at least an EA. Moreover, as a result of this error, Plaintiffs and the public were unable to comment on and provide rebuttal with respect to the Project's supporting documents and conclusions, such as those that discuss the Project's impacts to spotted owls. In other words, because of the wrongful categorical exclusion, the public could not play its normal role in the decisionmaking process under NEPA. *See Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557 (9th Cir. 2000) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)) (finding that when properly executed, NEPA "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.")

The District Court entered an order denying Plaintiffs' motion for summary judgment on August 16, 2017. ER 148, 1-11. The District Court found that Congress did not intend NEPA's review requirements to apply to treatment area designation under 16 U.S.C. § 6591a(b)(2), and that the "extraordinary circumstances" analysis of the effects of the Sunny South Project on the California spotted owl was adequate. ER 1-11.

On August 23, 2017, Plaintiffs were informed that logging would commence on September 15, 2017. Plaintiffs therefore moved for an injunction pending appeal in the District Court on August 30, 2017. ER 148. Defendants and Defendant-Intervenor opposed that motion on September 12, 2017, and Plaintiffs filed a reply on September 14, 2017. ER 148. On September 15, 2017, the District Court denied Plaintiffs' Motion for an Injunction Pending Appeal (ER 148), and the Ninth Circuit Motions Panel denied Plaintiffs' request for an injunction pending appeal, as well as for expedited briefing, on September 25, 2017.

While the logging pursuant to the Sunny South Project will likely be completed before this case can be heard and decided, the case will not become moot because there will still be relief available to Plaintiffs as to both issues that are before this Court. Specifically, the designated treatment areas remain available for future Projects, and therefore, NEPA review is still critically necessary as to those areas. Further, with respect to the Sunny South Project, not only is

11

declaratory relief available to Plaintiffs, this Court could order the Forest Service to (1) monitor the logged area to examine the impacts to the owls post Project, and/or (2) withdraw all California spotted owl habitat from being available for logging under section 6591b unless and until the Forest Service completes its NEPA analysis as to the section 6591a designated treatment areas.

## SUMMARY OF THE ARGUMENT

NEPA is "our basic national charter for protection of the environment." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1215-16 (9th Cir. 1998). It fulfills two core purposes when rightly followed: (1) it forces federal agencies to take a "hard look" at the environmental impacts of their actions, and (2) it preclude agencies from shunning the public during the decision-making process by requiring comment periods during which the public can respond to and rebut the agencies' data, choices, and conclusions in order to achieve less environmental harm from the action. *See e.g. Cascadia Wildlands v. BIA*, 801 F.3d 1105, 1110-1111 (9th Cir. 2015). These twin aims can only be realized through a federal agency's completion of an Environmental Impact Statement, or an Environmental Assessment.

Plaintiffs bring this case because the U.S. Forest abdicated its NEPA responsibilities in implementing 16 U.S.C. § 6591a and 16 U.S.C. § 6591b in the

national forests of California, and in so doing put at risk the continued existence of California spotted owls.

First, the Forest Service, in exercising its discretion under 16 U.S.C. § 6591a(b)(2) to designate 5.3 million acres of public lands as insect/disease treatment areas, failed to conduct any analysis at all under NEPA as to the environmental impacts of that designation decision. Had such analysis been properly executed, the Forest Service would have been required to consider and address the impacts of the designation with respect to the precarious status of California spotted owls, and such impacts could have been avoided or at least mitigated.

Defendants argue that NEPA does not apply to the designation decision because it "does not mandate or prohibit any particular future action," "does not in itself cause any actions to take place on the ground," and does not create direct or indirect effects "that can be meaningfully evaluated." ER 123-124. But these assertions are contradicted by Ninth Circuit precedent. In *California Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072 (9th Cir. 2011), this Court reiterated that an action, especially a programmatic action such as the treatment area designation decision at issue here, need not have immediate on the ground impacts to be subject to NEPA.

13

Furthermore, the District Court's conclusion that "the Farm Bill embodies a congressional intent not to subject area designations to NEPA analysis" (ER 6) is likewise contradicted by Ninth Circuit precedent. The District Court's statement that "Congress can specify a requirement for environmental assessments and environmental impact reports when it wants to" (ER 6) is the exact opposite approach that this Circuit has repeatedly mandated. In the Ninth, absent an *express exemption from NEPA* in a statute, NEPA applies to that statute unless one of two narrow exceptions to that general rule is present. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 648 (9th Cir. 2014) ("We have recognized two circumstances where an agency need not complete an EIS despite an absence of an express statutory exemption."). Here, neither 16 U.S.C. § 6591a nor the overall Healthy Forest Restoration Act (HFRA) contain an express exemption from NEPA. Instead, HFRA actually states that NEPA generally applies to the statute. *See* 16 U.S.C. § 6514. Moreover, the exceptions to the general rule of NEPA applicability—i.e., an "irreconcilable conflict" with NEPA or a displacement of NEPA by the statute in question—are not present here with respect to designation decisions under 16 U.S.C. § 6591a(b)(2).

In addition, the Forest Service improperly executed 16 U.S.C. § 6591b as to the Sunny South logging Project. 16 U.S.C. § 6591b permits the Forest Service to "categorically exclude" from full NEPA analysis some projects that occur in the

14

insect/disease treatment areas created under 16 U.S.C. § 6591b. However, when attempting to rely on a 6591b "categorical exclusion", and thereby bypass the normal EA or EIS process, the Forest Service must first demonstrate there are no "extraordinary circumstances" that will result from the Project. 36 C.F.R. § 220.6. In this case, the Forest Service wrongly concluded that the Sunny South Project would not result in "extraordinary circumstances" from its logging of essential owl habitat. The scientific literature in the administrative record makes plain that the logging to be completed by the Sunny South Project is likely to cause degradation of owl habitat which in turn will reduce the likelihood of owl survival and/or owl reproduction. This matters greatly because the owl population in the area has recently declined by a staggering 50%, and therefore, any further losses, such as from the Sunny South Project, are significant. In light of this reality it was arbitrary and capricious for the Forest Service to conclude that "extraordinary circumstances" do not exist and that there is no "uncertain[y] whether the proposed action may have a significant effect on the environment." 36 C.F.R. § 220.6.

Because an emergency injunction was denied in this case, the logging at issue may be complete before the case is decided. However, the case is not moot because relief is available as to both of Plaintiffs' issues. Specifically, the 5.3 million acres of designated treatment areas remain available for future Projects, and therefore, NEPA review of these section 6591a(b)(2) area designations is still

15

critically necessary. Further, with respect to the Sunny South Project, not only is declaratory relief available to Plaintiffs, this Court can order the Forest Service to (1) monitor the logged area to examine the impacts to the owls from the Project post-logging, and/or (2) withdraw all California spotted owl habitat from lands available for logging under section 6591b unless and until the Forest Service completes its NEPA analysis as to the section 6591a(b)(2) treatment area designation process in California.

## ARGUMENT

### A. Standard Of Review

As a general matter, an order granting a motion for summary judgment pursuant to Federal Rules of Civil Procedure 56 is reviewed de novo. *Gardner v. U.S. Bureau of Land Mgmt.*, 638 F.3d 1217, 1220 (9th Cir. 2011). Moreover, when, as here, "all claims raised in th[e] appeal relate to whether the district court's view of the law was erroneous," review is de novo. *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 759 (9th Cir. 2014).

A federal agency's compliance with NEPA is reviewed under the Administrative Procedure Act (APA), 5 U.S.C. § 706. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998). Under the APA, the reviewing court "shall hold unlawful and set aside agency action, findings, and

16

conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] without observance of procedure required by law . . . ." 5 U.S.C. § 706(2). A court is charged with conducting a "searching and careful" review of a challenged agency decision, and must "ensure that agency decisions are founded on a reasoned evaluation 'of the relevant factors.'" *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989).

## B. Defendants Violated NEPA By Failing To Conduct Any NEPA Analysis When Designating 5.3 Million Acres of National Forest In California As "Treatment Areas" Pursuant To 16 U.S.C. § 6591a(b)(2)

16 U.S.C. § 6591a contains two provisions under which the Chief of the U.S. Forest designates national forest land as "Treatment Areas" as part of an insect/disease treatment program. 16 U.S.C. § 6591a(b)(1) speaks to "Initial Areas" and focuses solely on areas "requested by the Governor of the State." This designation of Initial Areas is mandatory because once a request is made by a state governor that meets the criteria in 16 U.S.C. § 6591a(c), the Chief "shall" complete that request in accordance with 16 U.S.C. § 6591a(b)(1), including doing so "[n]ot later than 60 days after February 7, 2014."

16 U.S.C. § 6591a(b)(2), on the other hand, speaks to the designation of "Additional Areas," which are both proposed and approved by the Forest Service itself (rather than being proposed by a state governor). Importantly, the designation of these "Additional Areas" is discretionary—the Chief "may"

17

designate such areas.  And importantly as well, "Additional Areas" have no time

period within which they must be designated—in fact, they must be designated

"*[a]fter* the end of the 60-day period described in [16 U.S.C. § 6591a(b)(1)]."  16

U.S.C. § 6591a(b)(2) (emphasis added).

This case focuses solely on 16 U.S.C. § 6591a(b)(2), under which the Forest

Service chose to designate 5.3 million acres of "Additional Areas" in California.

ER 99.  No express exemption to NEPA exists in 16 U.S.C. § 6591a, yet

Defendants refused to conduct any NEPA analysis at all when acting under 16

U.S.C. § 6591a(b)(2).  Instead, the only explanation Defendants provide in the

administrative record is a two-page white paper (ER 123-124), in which they

cursorily assert that NEPA is inapplicable, without citation to any authority.  As

discussed below, the white paper's assertions violate Ninth Circuit precedent, and

similarly, both the Forest Service and the District Court failed to adhere to Ninth

Circuit caselaw when assessing Congress' intent in 16 U.S.C. § 6591a(b)(2).  In

this Circuit, the general rule is that NEPA applies to federal actions taken pursuant

to other substantive statutes unless one of the Ninth Circuit's narrow exceptions to

that general rule is present. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747

F.3d 581, 648 (9th Cir. 2014) ("We have recognized two circumstances where an

agency need not complete an EIS despite an absence of an express statutory

exemption.").  Here, neither the Forest Service nor the District Court

18

acknowledged that caselaw, yet the District Court ruled that Congress did not intend for NEPA to apply to 16 U.S.C. § 6591a(b)(2). As discussed below, both Supreme Court and Ninth Circuit precedent support Plaintiffs, and this Court should follow its precedent and find that the Forest Service must comply with NEPA when acting pursuant to 16 U.S.C. § 6591a(b)(2).

### 1. The Forest Service's White Paper Violates Ninth Circuit Precedent

In a white paper in the record (ER 123-124), the Forest Service asserts that NEPA does not apply to treatment area designation decisions. The white paper argues: (1) "A designation does not mandate or prohibit any particular future action"; (2) "Designation of Landscape-Scale areas does not in itself cause any actions to take place on the ground, nor do they create an obligation for any activity in the future. . . . [A]n analysis of effects would be speculative and not meaningful;" and (3) "There are no effects that can be meaningfully evaluated. The designation of areas does not create environmental disturbances (i.e., direct effects). Nor does designation create indirect effects. There is also no irretrievable or irreversible commitment of resources at this stage." *Id*.

This Circuit, in a closely analogous case, has found that the assertions in the white paper are without merit. In *California Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1080 (9th Cir. 2011), the Court reviewed the Department of Energy's "designation of an area as a 'national interest electric transmission

corridor [NIETC],' [which] makes available a fast-track approval process to utilities seeking permits for transmission lines within the corridor." *Id*. at 1080. Like the Forest Service's designation of "treatment areas" under 16 U.S.C. § 6591a(b)(2) in this case, the Department of Energy designated the NIETCs pursuant to a Congressional act (referred to as EPAct), and then argued that no NEPA analysis was necessary with respect to the NIETC designations "because the NIETCs do not have any environmental effects." *Id*. at 1098.

The Ninth Circuit rejected the Department of Energy's argument because "the NIETCs, in essence, influence the areas in which electric transmission facilities will be located, even though they do not determine the precise locations of the facilities." *California Wilderness Coal.*, 631 F.3d at 1098. The Court explained that "the locations of those areas could have great historic and regional consequences that significantly affect the environment." *Id*. The Court also noted that "NEPA may require review of 'programmatic' decisions that prescribe future actions, even though project-specific NEPA review will occur before a particular project is undertaken" and that while the agency "maintains that the NIETCs are not programmatic decisions with reasonably-foreseeable future effects," without at least conducting an EA, "it is impossible to fairly determine whether project-specific impacts are reasonably foreseeable, whether there are 'programmatic effects,' and whether the Designation has any impact on sensitive areas." *Id.* at

1101-03.[4]  The Court further noted that "the NIETCs do diminish legal protections. . . ." *Id.* at 1103.

Much the same is true here of the insect and disease treatment program areas—the designated areas clearly influence where treatment projects will occur even though they do not determine precisely where the projects will occur or that projects will in fact occur on every designated acre.  Consequently, the locations of those designated treatment areas could have great consequences that significantly affect the environment—indeed, the Sunny South Project makes that plain as it shows unequivocally the potential for consequences to spotted owl habitat.  Thus, just as "the fact that the NIETCs do not approve the actual sitings of specific transmission facilities does not excuse DOE from considering the NIETCs' environmental impacts," *id*. at 1098, so too is the Chief of the Forest Service not excused from considering environmental impacts of the designated treatment areas under NEPA.  Moreover, the Court made clear that this Circuit's "precedent . . . provides that agency action may constitute a 'major Federal action' even though

---

[4] As Defendants are well aware, NEPA applies not just to site-specific projects (like the Sunny South Project), but to "projects *and programs* entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals (§§ 1506.8, 1508.17)." 40 C.F.R. § 1508.18 (the regulation goes on to explain that "actions tend to fall within one of the following categories: (1) Adoption of official policy. . . (2) Adoption of formal plans . . . (3) Adoption of programs . . . (4) Approval of specific projects . . . .")

the program does not direct any immediate ground-breaking activity." *Id.*[5]

In *California Wilderness Coal.*, the Department of Energy, like the Forest Service in this case, also argued that the NIETCs were not subject to NEPA analysis "because it would be pure speculation to predict their environmental impacts." *Id.* at 1099. But the Court rejected that position too: "There may be merit to some of DOE's arguments in terms of limiting the scope of an EIS or in explaining why an EA and not an EIS should be prepared, but they fail both as a matter of law and fact to justify DOE's failure to undertake any study of the potential environmental impacts." *Id.* at 1102-03. The Court further noted that "effects may be difficult to measure and may be determined ultimately to be too imprecise to influence the Designation, but this is precisely the type of determination that only can be intelligently made after the preparation of at least an EA." *Id.* at 1103.

Here, the insect/disease treatment area designation covers millions of acres

---

[5] The Court explained further that "*Forelaws* does not stand alone in holding that broad agency programs may constitute 'major Federal actions,' even though the programs do not direct any immediate ground-disturbing activity. *See Oregon Natural Desert Ass'n v. BLM*, 531 F.3d 1114, 1116 (9th Cir. 2008) (finding EIS inadequate for land use plan covering a large portion of Oregon); *N. Alaska Envtl. Ctr v. Kempthorne*, 457 F.3d 969, 973 (9th Cir. 2006) (noting that an EIS was prepared for agency action making entire Northwest Petroleum Reserve available for oil and gas leasing despite the lack of 'site specific analysis for particular locations where drilling might occur'); *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 800-01 (9th Cir. 2003) (evaluating programmatic EIS for land use plan for national park)…." *Id.* at 1098-1099.

in California (ER 99), impacting vast portions of the state of California (see map at ER 97), and can curtail Plaintiffs' rights under NEPA by creating additional areas where HFRA's streamlined NEPA process is utilized (*see* section 6591a(d)(2),(3)) and areas where NEPA categorical exclusions can be used (under section 6591b(a)) to comply with NEPA instead of the traditional EA or EIS process. Thus, there should be no question that this situation too fails both as a matter of law and fact in light of the failure by the Forest Service to undertake any study of the potential environmental impacts from the designation decision. Moreover, this case illustrates quite poignantly a major aspect of the potential environmental impacts of the treatment areas designation—very real harm to wildlife, including here, a "sensitive species" that is being considered for Endangered Species Act listing. Thus, regardless of whether the Forest Service thinks effects are too difficult to measure, the reality is, this Circuit has determined that is precisely the type of determination that only can be intelligently made after the preparation of at least an EA as required in the *California Wilderness Coal.* case.

The District Court in this case discounted the *California Wilderness Coal.* precedent, stating as follows (ER 6):

> [T]here are important differences between application of the Energy Policy Act in *California Wilderness Coalition* and application of the Farm Bill in this case. Most importantly, the Energy Policy Act expressly left all NEPA requirements intact, except where otherwise noted. 16 U.S.C. § 824p(j)(1). By contrast . . . Congress created a categorical exclusion from NEPA review for projects within an area

23

designation. 16 U.S.C. § 6591a; *see Public Citizen*, 541 U.S. at 767. And the Ninth Circuit found the decision of where to place national interest electric transmission corridors to be a final agency action in part because it concludes the agency's responsibilities. *Cal. Wilderness Coal.*, 631 F.3d at 1100. By contrast, an area designation is a preliminary step for the Forest Service before potentially implementing treatment projects. 16 U.S.C. §§ 6591a, 6591b. Finally, the Energy Policy Act provisions about the creation of national interest electric transmission corridors do not suggest an intention to create an expedited process, while Congress clearly intended the Farm Bill to create an expedited designation process for areas needing insect and disease treatment.

But each of those points is off-base. First, 16 U.S.C. § 6591a leaves HFRA's NEPA requirements in place for projects by stating: "**EFFECT[:]** Projects carried out under this subsection shall be considered authorized hazardous fuel reduction projects for purposes of the authorities described in paragraph (2) [subsections (b), (c), and (d) of section 6512 . . . and sections 6514, 6515, and 6516 . . . .]." Section 6514 states: "Except as otherwise provided in this subchapter, the Secretary shall conduct authorized hazardous fuel reduction projects in accordance with—(1) the National Environmental Policy Act of 1969 [42 U.S.C. 4321 et seq.] . . . ." Thus, there simply are no exceptions to NEPA in section 6591a.

Second, the District Court's implied argument that designation decisions are not final enough to be the right kind of final agency action for NEPA review is

24

wrong.  The designation decision is a final agency action under the APA,[6] and it

concludes the agency's responsibilities under section 6591a—indeed, that is title

of section 6591a: "Designation of treatment areas."  *See also California*

*Wilderness Coal.* at 1100 ("Here, the NIETCs are undoubtedly final agency

actions. The NIETCs conclude DOE's responsibilities under § 216.").  Further,

whether "an area designation is a preliminary step for the Forest Service before

potentially implementing treatment projects" is irrelevant with respect to whether

NEPA applies to the designation decision.  Agencies regularly comply with NEPA

at both the programmatic level and the project level, and in fact, CEQ has

promulgated NEPA regulations to address this (*see e.g.*, 40 C.F.R. § 1502.20

["Whenever a broad environmental impact statement has been prepared (such as a

program or policy statement) and a subsequent statement or environmental

assessment is then prepared on an action included within the entire program or

policy (such as a site specific action) the subsequent statement or environmental

assessment need only summarize the issues discussed in the broader statement and

incorporate discussions from the broader statement by reference and shall

concentrate on the issues specific to the subsequent action."])

---

[6] The designation decision "marks the consummation of the agency's
decisionmaking process," and is "an action from which 'legal consequences will
flow,'" because, for example, it alters the legal regime for projects (under both
6591a and 6591b) conducted within the designated treatment areas. *See Bennett v.
Spear*, 520 U.S. 154, 156 (1997).

As discussed in *California Wilderness Coal.*, "in some instances NEPA may require review of 'programmatic' decisions that prescribe future actions, even though project-specific NEPA review will occur before a particular project is undertaken." *Id.* at 1101; *see also* 40 C.F.R. § 1508.18(b)(3). But whether it is one agency, as is the case here, or two different agencies as in *California Wilderness Coal,* preparing the programmatic and the project-specific NEPA review is immaterial to determine whether the programmatic NEPA review is required; and Plaintiffs are aware of no case ever stating such from this Circuit. In *California Wilderness Coal*, the Department of Energy was attempting to avoid programmatic level NEPA analysis for the same reasons the Forest Service does here (e.g., "because the NIETCs do not approve any specific sites, they have no meaningful environmental impact" (631 F.3d at 1103)), but as already addressed above, this Circuit rejected such reasoning.

Moreover, the *California Wilderness Coal.* Court pointed out that the agency's reasoning "fails to appreciate that a decision to encourage, through a number of incentives, the siting of transmission facilities in one municipality rather than another has effects . . . in terms of the values of land and proposed and potential uses of land." *Id.* at 1103. The siting of treatment areas under 6591a(b)(2) in one area versus another likewise has effects, here in terms of the potential uses of the designated land or in terms of what values, such as wildlife

26

values, will be harmed. To help illustrate the issue, the *California Wilderness Coal* Court provided an example—"the West-wide Corridors Designation" programmatic NEPA analysis—where programmatic NEPA analysis was conducted even though the Designation at issue "did not approve any specific sites, but designated specific areas for sites." *Id*. at 1103-04. The Court pointed out that "[n]onetheless, the lead agencies. . . reshaped the corridors in response to the [Programmatic EIS] to exclude certain sensitive lands." *Id*. at 1105. Here too, that is clearly a possible outcome as well because the Forest Service could reshape the treatment areas to avoid (or at least minimize) impacts to sensitive lands such as the designated owl habitat that is at the center of this case.

The District Court's third point, that "the Energy Policy Act provisions about the creation of national interest electric transmission corridors do not suggest an intention to create an expedited process" (ER 6), is belied by the fact that *California Wilderness Coal.* noted that the goal of the Energy Policy Act was to "make available a *fast-track* approval process to utilities seeking permits for transmission lines within the corridor." *Id.* at 1080 (emphasis added). And the District Court conflates 6591a(b)(1) and 6591a(b)(2) when it asserts that "Congress clearly intended the Farm Bill to create an expedited designation process for areas needing insect and disease treatment." As discussed in more detail below, only section 6591a(b)(1) contains a timeframe for designation, and

27

this case is not about 6591a(b)(1). Moreover, the facts of this case undermine any

conflict between NEPA and an expedited process because the Forest Service did

not seek a 6591a (b)(2) designation until July of 2015 (ER 99), and it was not

approved until November of 2015 (ER 96)—NEPA could easily have been

addressed in the 19 months between the availability of section 6591a(b)(2) to the

agency (April of 2014) and the agency's actual use of it (November of 2015).

Thus, none of the reasons provided by the District Court for not following

*California Wilderness Coal.* actually apply here, and instead this Court should

find that *California Wilderness Coal.* is directly applicable and requires the Forest

Service to at least complete an EA as to its 6591a(b)(2) designation decision.

    The District Court also agreed with the Forest Service's white paper when

the Court concluded that "the area designation has only potential or contingent

effects on the environment, to which NEPA does not apply . . . ," "the area

designation did not create activities which impact the physical environment," and

"that any potential effects of the area designation cannot be meaningfully

evaluated."[7] ER 4-5. But as already discussed, the *California Wilderness Coal.*

---

[7] The white paper's statement that "[t]here is also no irretrievable or irreversible commitment of resources at this stage" is meaningless because that issue is irrelevant to whether NEPA analysis is necessary. A programmatic NEPA analysis need not be site-specific if there is yet to be an irreversible and irretrievable commitment of resources, but such programmatic analysis must nonetheless occur. For example, as discussed in *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 800-01 (9th Cir. 2003): "An EIS for a programmatic plan . . . must provide

case addressed and rejected these same arguments. A core theme of *California Wilderness Coal.* is that it does not matter if an action does not have immediate, on-the-ground impacts—the action can still nonetheless have potential impacts by, for example, influencing the areas where on-the-ground impacts will occur, even if the action does not determine the precise location of those impacts. *California Wilderness Coal.*, 631 F.3d at 1098. Furthermore, NEPA's own regulations speak not just to direct effects, but also to indirect effects. "Indirect effects" are defined as those effects "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8. Indirect effects can be "ecological" as well as "aesthetic" *Id*. Here, it is reasonably foreseeable that the designation of treatment areas will result in ecological or aesthetic effects, and the Sunny South Project plainly illustrates that reality. While certainly the on-the-ground impacts are later in time than the designations, the regulations account for that so long as the impact is reasonably foreseeable. Here, treatments (such as this Sunny South logging Project) are

---

sufficient detail to foster informed decision-making, but site-specific impacts need not be fully evaluated until a critical decision has been made to act on site development . . . i.e., when the agency proposes to make an irreversible and irretrievable commitment of the availability of resources to project at a particular site." *See also California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982) ("When a programmatic EIS has already been prepared, we have held that site-specific impacts need not be fully evaluated until a 'critical decision' has been made to act on site development. . . . This threshold is reached when, as a practical matter, the agency proposes to make an 'irreversible and irretrievable commitment of the availability of resources' to a project at a particular site.")

clearly reasonably foreseeable to occur in the designated treatment areas, as that is the primary intent of designating the treatment areas, and it is axiomatic that ecological and aesthetic effects are reasonably foreseeable from those treatments (such as the logging here) given that the primary point of the designation is to address insect or disease threats. Thus, the impacts of such treatments must be considered pursuant to NEPA.

In addition, the *California Wilderness* Court addressed the *Northcoast* case (136 F.3d 660 (9th Cir. 1988)), which the District Court cites (ER 4), and stated:

> We doubt that a NIETC is similar to the management guidelines at issue in *Northcoast*, but even if we were to engage in this fiction, this case does not contain the critical factual element present in *Northcoast*: a record that supports the reasonableness of the agency's decision not to prepare an EIS or EA. We cannot accept DOE's unsupported conclusion that its final agency action that covers ten States and over a 100 million acres does not, as a matter of law, have some environmental impact. . . . DOE has failed to present the documentation necessary to allow us to determine that there are no environmental impacts or that DOE took a "hard look" at the environmental impacts.

*California Wilderness Coal.*, 631 F.3d at 1105. The same is true here—there is no record beyond the two-age white paper to support the agency's decision here, a decision which covers all of California and 5.3 million acres.

The District Court's citation to *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004) is also inapposite. ER 4. The "rule of reason" the case speaks to does not apply to the case at bar, and if anything, the case strongly supports

30

Plaintiffs here.  In *Dep't of Transp.*, the Supreme Court dealt with the Federal

Motor Carrier Safety Administration's (FMCSA) promulgation of rules governing

Mexican motor carriers' applications to operate in the US, which resulted from the

President lifting a congressional moratorium on cross-border operation of

Mexican motor carriers. *Id.* at 759-61. The plaintiffs in that case challenged the

FMCSA's failure to "take into account the environmental effects of increased

cross-border operations of Mexican motor carriers." *Id.* at 765.  The Supreme

Court found no proximate causation because the FMCSA had no authority to

"countermand the President's lifting of the moratorium or otherwise categorically

to exclude Mexican motor carriers from operating within the United States." *Id.* at

766.  The *Dep't of Transp.* Court stressed that NEPA serves two main purposes—

to ensure "that the agency…will have available, and will carefully consider,

detailed information concerning significant environmental impacts [and]…that the

relevant information will be made available to the larger audience that may also

play a role in both the decisionmaking process and implementation of that

decision." *Id.* at 768 (citations omitted).  The Supreme Court concluded that

neither of these statutory purposes would be achieved because FMCSA lacked the

authority to prevent effects claimed by the plaintiffs because "FMCSA simply

lacks the power to act on whatever information might be contained in the EIS." *Id.*

The Court connected the dual purposes of NEPA with its causation analysis: "In

these circumstances, the underlying policies behind NEPA, informed by the 'rule of reason,' make it clear that the causal connection[] . . . is insufficient." *Id.* at 767-68 (citation omitted).

In contrast to the FMCSA in *Dep't of Transp.*, the Chief of the Forest Service here would in fact have the authority to act on information obtained during the NEPA process. The Chief can use his discretion in determining what areas are suitable for designation as treatment areas under 6591a(b)(2), as long as the areas ultimately designated meet the criteria established in that section. Input on environmental impacts from proposed designations could have been garnered from the public during the NEPA process and then used when deciding the ultimate designations so as to prevent, avoid, or reduce impacts identified by the public or other agencies. For example, the ultimately designated treatment areas could have avoided designated owl habitat, in whole, or at least in part (such as avoiding all occupied owl habitat). Thus, the "rule of reason" that *Dep't of Transp.* speaks to is not a problem in this case because the Chief does possess the power to act on information contained in an EA or EIS, such as with respect to sensitive areas. Indeed, the fact that the purposes of NEPA will be fulfilled by adhering to NEPA here shows that *Dept of Transp.* supports Plaintiffs' position.

In sum, no NEPA analysis has been done *at all* with respect to the designation of the treatment areas under section 6591a(b)(2), and Plaintiffs seek an

order from this Court that the agency must prepare a NEPA analysis in the first instance. As noted in *Conner v. Burford*, 848 F.2d 1441, 1446 (9th Cir. 1988), "[t]he purpose of an EIS [or EA] is to apprise decisionmakers of the disruptive environmental effects that may flow from their decisions at a time when they 'retain[] a maximum range of options.'" Here, the agency retains the maximum range of options to consider disruptive effects at the time of the designation, and thus NEPA analysis should be done at the time of the designation. Again, if NEPA analysis is performed, as it should be, one option would be to exclude California spotted owl habitat, or at least some subset of that habitat, from designated treatment areas so as to avoid serious harm to the owls. And that option can only be explored if the Chief of the Forest Service is required to go back and comply with NEPA as to the section 6591a(b)(2) treatment area designation for California.

## 2. The Statute Contains No Express Exemption From NEPA, And The Ninth Circuit's Limited Exceptions To The General Rule That NEPA Applies Are Not Present Here

The District Court concluded: "In short, the Farm Bill embodies a congressional intent not to subject area designations to NEPA analysis. Congress can specify a requirement for environmental assessments and environmental impact reports when it wants to." ER 6. This conclusion, however, fails to adhere to the approach that this Circuit has mandated with respect to determining whether NEPA applies to a particular statute. In the Ninth, absent an express exemption

from NEPA in a statute, NEPA applies to that statute unless one of two narrow exceptions to that general rule is present. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 648 (9th Cir. 2014).

As discussed in *San Luis*, "Congress has expressly provided that NEPA does not apply to certain statutory schemes. For example, 'No action taken under the Clean Air Act shall be deemed a major Federal action significantly affecting the quality of the human environment within the meaning of the National Environmental Policy Act of 1969.' 15 U.S.C. § 793(c)(1)." *Id*. at 647. In short, "Congress has repeatedly demonstrated that it knows how to exempt particular substantive statutes from the EIS requirement when it wishes to do so." *Id*. Consequently, if a statute does not contain an express exemption from NEPA, then an agency cannot excuse itself from NEPA unless it can demonstrate that one of two narrow circumstances exists that this Circuit recognizes. *Id*. at 648. "First, an agency is excused from complying with NEPA where doing so 'would create an irreconcilable and fundamental conflict' with the substantive statute at issue." *Id*. (citation omitted). Second, this Circuit has "identified a limited number of instances where a substantive statute has 'displaced' NEPA's requirements, even though there is not 'an irreconcilable' conflict between the substantive statute and the EIS requirement." *Id*. (citation omitted).

Here, nowhere in 16 U.S.C. § 6591a, or in the Healthy Forest Restoration

Act (16 U.S.C. § 6501 *et seq.*), is there an express exemption from NEPA. Instead, the statute contains express statements that strongly support NEPA's application. First, the Healthy Forest Restoration Act, at section16 U.S.C. § 6514 (titled "Environmental analysis") states: "Except as otherwise provided in this subchapter, the Secretary shall conduct authorized hazardous fuel reduction projects in accordance with—(1) the National Environmental Policy Act of 1969 [42 U.S.C. 4321 et seq.] . . . ." Moreover, 16 U.S.C. § 6591a itself refers back to 16 U.S.C. § 6514, stating: "Projects carried out under this subsection shall be considered authorized hazardous fuel reduction projects for purposes of the authorities described in paragraph (2) [one of which is 16 U.S.C. § 6514]." Given that projects conducted under the Healthy Forest Restoration Act must comply with NEPA, as well as this Circuit's recognition of the "congressional desire that [courts] make as liberal an interpretation as [they] can to accommodate the application of NEPA," *Jones v. Gordon*, 792 F.2d 821, 826 (9th Cir. 1986), it must be assumed as a starting point that designation actions made by the Chief under 16 U.S.C. § 6591a(b)(2) are subject to NEPA. And, as explained below, neither of the Ninth Circuit's two narrow exceptions to the general rule of NEPA applicability are present in this case.

### a. There Is No Irreconcilable Conflict

Two cases, the Supreme Court's *Flint Ridge* decision and this Circuit's

*Jones* decision, laid the foundation for the "irreconcilable conflict" NEPA exception.

*Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Oklahoma*, 426 U.S. 776 (1976) dealt with the Interstate Land Sales Full Disclosure Act, which "requires a developer to register a subdivision by filing with the Department of Housing and Urban Development (HUD) a statement of record" containing certain information about the land in question. *Id.* at 776. The statement goes into effect either 30 days after filing, or if it is incomplete or inaccurate, within 30 days after the developer filing the correct and complete statement. *Id.* Plaintiffs in the case requested that HUD conduct NEPA review before allowing the statement of record to go into effect. *Id.* The Supreme Court, however, held that the NEPA requirements were not applicable to the approval of the statement of record because there was a fundamental conflict of statutory duty: "the Secretary cannot comply with the duty under the Disclosure Act to allow statements of record to go into effect within 30 days of filing . . . and simultaneously prepare impact statements on proposed developments." *Id.* at 777. If the statement of record "is on its face complete and accurate . . . it must be permitted to go into effect. The Secretary has no power to evaluate the substance of the developer's proposal . . . ." *Id.* at 781. The Supreme Court also stressed, however, that NEPA is to be applied to the "fullest extent possible" and only when a statute "expressly prohibits or makes full compliance

with one of [NEPA's] directives impossible" can NEPA be sidestepped in any way. *Id*. at 787-88.

Ten years after the *Flint Ridge* decision, this Circuit faced a similar situation in *Jones v. Gordon*, 792 F.2d 821. The *Jones* case dealt with a challenge to the National Marine Fisheries Service's (NMFS) decision to issue permits under the Marine Mammal Protection Act (MMPA) allowing Sea World to capture killer whales. *Id.* After publishing Sea World's permits request in the Federal Register as required, and after soliciting public comment, NMFS "issued a permit to Sea World authorizing the permanent removal of up to 10 killer whales and the temporary capture of up to 90." *Id.* at 823. NMFS did not, however, conduct any NEPA review prior to issuing the permits. *Id.*

Sea World argued that NMFS was not required to comply with NEPA planning requirements because "NEPA conflicts irreconcilably with the mandatory time limits for agency action under section 104(d) of the MMPA." *Id.* at 825. Specifically, once NMFS publishes the notice of a permit request in the Federal Register, the MMPA "requires that the Service grant or deny a permit . . . within 90 days after publication of notice plus the length of any hearing." *Id.* Sea World argued that the 90 day limitation made it impossible to complete NEPA analysis, which would take approximately 360 days to complete. *Id.* According to Sea

World, this amounted to an irreconcilable conflict and precluded the applications of NEPA. *Id.*

This Circuit rejected Sea World's position. First, the Court stressed that Congress has expressed a desire for NEPA to apply "to the fullest extent possible," meaning that "no agency shall utilize an excessively narrow construction of its existing statutory authorizations to avoid compliance." *Id.* at 826 (citations omitted). With that principle in mind, the Court found that Sea World's perceived conflict between the time restraints of the MMPA and NEPA was reconcilable. The Court explained that because the "triggering act for the statutory time table, the publication of a notice of a permit application, is within the Control of [NMFS]," nothing in the MMPA actually prevents NMFS form first complying with NEPA before publishing notice of the permit request in the Federal Register and thereby initiating the statutory time table. *Id.* Thus, *Jones* makes clear that this Court should err on the side of NEPA, and as long as there exists some way to accommodate NEPA, an irreconcilable conflict cannot be said to exist.

In this case, there is nothing remotely irreconcilable about 6591a(b)(2) with respect to NEPA. As noted above, unlike 6591a(b)(1), which contains a 60 day time limit and mandatory "shall" language, 6591a(b)(2) contains no time limit at all and is entirely discretionary (i.e, its "may" language). Furthermore, an interpretation of § 6591a(b)(2) that requires the application of NEPA would *further*

38

the congressional purposes behind HFRA, which include "to protect, restore, and enhance forest ecosystem components" for the benefit of imperiled wildlife and to improve biological diversity. *See* 16 U.S.C. § 6501. In short, there is no mandatory timeframe, like there was in *Flint Ridge* (30 days), which could conceivably create an irreconcilable and fundamental conflict. *See also San Luis,* 747 F.3d at 648 ("There is no 'irreconcilable and fundamental conflict' between NEPA and Section 7 of the ESA. Although [section 7 of the ESA] sets out a timetable for the consultation process, it is flexible enough to accommodate the preparation of an EIS."). In fact, the record in this case shows that the Forest Service waited until July 2015 to request (ER 99), and November 2015 to formally approve (ER 96), the designation of the "additional areas" at issue in this case, which demonstrates that Defendants had the time to conduct NEPA analysis (the statute was enacted in February 2014 (ER 103)). Thus, the "irreconcilable conflict" exception to NEPA applicability provides no cover for the Forest Service here as to the designation of "additional areas."

### b. NEPA's Requirements Have Not Been Displaced

"[This Circuit has] held that an agency action might be exempt from NEPA even 'without th[e] 'irreconcilable' statutory conflict' identified in *Flint Ridge. Douglas Cnty*., 48 F.3d at 1502; *see also Drakes Bay Oyster*, 729 F.3d at 984; *Merrell*, 807 F.2d at 778." *San Luis*, 747 F.3d at 649.

In *Douglas County* (48 F.3d 1495 (9th Cir. 1995)), for example, this Circuit determined that Congress intended to "displace" NEPA's procedures when authorizing the designation of critical habitat under Section 4 of the Endangered Species Act. The Court reasoned that because the critical habitat designation process "requires that the Secretary examine the effects of his or her actions by taking into account economic and other relevant impacts," and to examine "the best scientific data available," that would result in the consideration of "impacts that concern NEPA. . . ." *Douglas County,* 48 F.3d at 1503. The Court relied on the fact that "[t]he critical designation process also provides for public notice, another goal of NEPA." *Id*. Requiring NEPA compliance would "sabotage the delicate machinery that Congress designed" because "Congress through debate and compromise forged a specific process for the Secretary to follow when addressing the [critical habitat] needs of endangered species." *Id*.

In *San Luis*, on the other hand, which examined the applicability of NEPA to section 7 of the ESA (the agency consultation requirement), the Court determined that NEPA does apply. 747 F.3d at 649-652. This was so because "[w]hile a BA [biological assessment under ESA section 7] analyzes the impact of a proposed action upon endangered species, an EA [under NEPA] analyzes the impact of the proposed action on all facets of the environment. Thus, if only a BA is prepared there may be gaps in the agency's environmental analysis." *Id*. at 649 (citation and

40

quotation omitted). The *San Luis* Court further explained that "the ESA's Section 7 consultation process fails to provide for public comment in the same way that NEPA does," and noted that this fact "is particularly important because '[p]ublication of an EIS, both in draft and final form, also serves a larger informational role. It gives the public the assurance that the agency 'has indeed considered environmental concerns in the decisionmaking process,' and, perhaps more significantly, provides a springboard for public comment." *Id.* at 649-50 (citations omitted). The *San Luis* Court thus found that it "cannot say that Section 7 of the ESA renders NEPA 'superfluous' when the statutes evaluate different types of environmental impacts through processes that involve varying degrees of public participation." *Id.* at 650.

Here, the facts are even stronger than in *San Luis* to support the applicability of NEPA to 16 U.S.C. § 6591a(b)(2). Absent at least an EA, there will be no analysis at all of the impacts of the designation of Additional Areas, and likewise there will be no public participation at all in that designation decision. Thus, here too, it cannot be said that 16 U.S.C. § 6591a somehow renders NEPA superfluous.

The *San Luis* Court also recognized that NEPA can be displaced by a separate substantive statute if the processes outlined therein are sufficiently *different* from NEPA; as the Court notes, while "*Douglas County* holds that Section 4 of the ESA renders NEPA superfluous because the processes are

41

sufficiently similar, [] *Merrell* holds that FIFRA renders NEPA superfluous because the processes are sufficiently different." *Id.* at 650.

The Court in *San Luis* distinguished the *Merrell* decision, and found that the differences between NEPA and Section 7 of the ESA are not significant enough to displace NEPA. Those differences include: disparate public comment procedures under ESA section 7 and NEPA; more limited effects analysis of an ESA Biological Assessment (BA) that only focuses on species-level impacts rather than impacts to all facets of the environment as required by NEPA; and more lax cumulative impact analysis of the ESA, requiring the Fish and Wildlife Service to consider only the cumulative impacts of non-federal actions. *Id.* at 649-50. Even in light of these differences the Court concluded: "we do not think that the distinctions are as pronounced as those in *Merrell* . . . . As we have observed, Congress specifically contemplated that an agency could comply with NEPA while discharging its duties under Section 7 of the ESA . . . . Under these circumstances, we cannot conclude . . . requiring Reclamation to produce an EIS 'would sabotage the delicate machinery that Congress designed.'" *Id.* at 650 (quoting *Merrell,* 807 F.2d at 779).

The *San Luis* Court also relied on textual evidence within the ESA to show that Congress intended that NEPA apply to Section 7, and reiterated that Congress can, if it wishes, expressly *exclude* the application of NEPA to a portion, or to the

42

entirety, of any given substantive statute. *Id.* at 647. In examining the ESA, the Court further found that "Congress's decision to exempt certain decisions by the Endangered Species Committee from the EIS requirement reaffirms that NEPA applies to other actions under Section 7 of the ESA [....]" *Id.* This mirrors the statutory structure of HFRA, which provides for a categorical exclusion under NEPA for project-level decisions at section 6591b, while refraining from including a similar exclusion for landscape-level designation decisions at section 6591a (which instead cites to section 6514, which speaks explicitly to NEPA applicability).

The *San Luis* Court also highlighted the fact that Section 7 of the ESA explicitly contemplates that "an agency could comply with NEPA while discharging its duties under Section 7 of the ESA. *See* 16 U.S.C. § 1536(c)(1) (explaining that the biological assessment required by Section 7… 'may be undertaken as part of a Federal agency's compliance with [NEPA']')." *Id.* at 650. This too mirrors the situation in HFRA, which, (1) in section 6514, explicitly speaks to the applicability of NEPA to HFRA: "Except as otherwise provided in this subchapter, the Secretary shall conduct authorized hazardous fuel reduction projects in accordance with…[NEPA],"[8] and (2) in the designation section itself

---

[8] Section 6514 allows some minor tweaks to NEPA analysis, such as limiting the number of alternatives the agency is required to consider when performing an EA

(6591a), explicitly references section 6514. The plain language of HFRA therefore rebuts any claim that Congress did not intend NEPA to apply to designation decisions.

A look at the *Merrell* situation further illustrates that the Healthy Forest Restoration Act does not approach the scope necessary to displace NEPA. In *Merrell*, the Court found NEPA inapplicable to FIFRA due to numerous unique aspects of FIFRA, including (1) the ability to withhold information bearing on trade secrets, whereas NEPA does not contain such restrictions; (2) "Congress expected [the EPA] to reach a decision within three months of receiving a[] [FIFRA] application [which] is incompatible with the lengthy research and hearings that are ordinarily part of preparing an EIS."; and (3) "When Congress amended FIFRA in 1975, 1978, and 1984, the EPA had interpreted FIFRA so as not to require compliance with NEPA. And when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the 'congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." *Id*. at 778-79 (citations and quotations omitted).

The HFRA contains no such oddities with respect to section 6591a(b)(2) designation decisions. The *Merrell* decision relies on the confluence of varied and

---

or EIS, but this merely shows that Congress knows how to tweak NEPA analysis when it wants to, not that NEPA does not apply at all.

overlapping processes within FIFRA to illustrate that Congress created a statutory scheme that is intended to displace NEPA.  HFRA simply does not involve a similarly fine-tuned statutory structure as in *Merrell*, and instead explicitly invokes NEPA's application overall (section 6514), with explicit tweaks to NEPA when it wants to (e.g., section 6514 as to alternatives, and section 6591b as to some projects falling under NEPA's categorical exclusion process).

At base, this case is not a situation where applying NEPA "would sabotage the delicate machinery that Congress designed."  Moreover, if anything, application of NEPA to "Additional Areas" designations would help the Forest Service achieve the goals of effectively managing insects/disease by focusing such additional areas in places that, as identified through the NEPA process, will avoid harm to important wildlife habitat or other sensitive spaces.  Consequently, this Court should find that HFRA does not displace the application of NEPA to landscape-scale designation decisions made by the Forest Service pursuant to 16 U.S.C. § 6591a(b)(2).

## C. The Forest Service's Reliance On A "Categorical Exclusion" Violates NEPA Because "Extraordinary Circumstances" Exist Which Preclude The Use Of A Categorical Exclusion

Not only might the Sunny South Project never have gone forward had NEPA analysis been conducted with respect to the designation of "additional" treatment areas under 16 U.S.C. § 6591a(b)(2), the Project was unlawfully

"categorically excluded" from NEPA analysis. Instead, at least an EA should

have been conducted because "extraordinary circumstances" are present, as

explained below.

The Sunny South Project was "considered an action categorically excluded"

from the normal NEPA process, and consequently, neither an Environmental

Assessment ("EA") nor Environmental Impact Statement ("EIS") was conducted

for the Project.[9] ER 37-38. When assessing a "categorically excluded" (CE)

project, however, the Forest Service must determine whether any "extraordinary

circumstances" exist. 40 C.F.R. § 1508.4; 36 C.F.R. § 220.6; s*ee also* ER 119

(Forest Service document stating: "**Q. How should the responsible official**

**determine if the section [6591b] CE is appropriate for a project? A.** . . .

agency policy requires that when deciding whether to utilize a categorical

exclusion two screens apply. . . . The second screen is the consideration of

extraordinary circumstances. The responsible official must determine if

extraordinary circumstances precludes the use of a CE, as identified in 36 CFR

220.6(b) and FSH1909.15 (31.2).")

In this case, the presence of a "sensitive species" within the Project area

---

[9] *See* ER 118 (showing a question and answer document published by the Forest
Service stating: **"Q. Is [16 U.S.C. § 6591b](a)(1) a statutory exemption from
NEPA or a categorical exclusion under NEPA? A.** The legislated CE created
under [16 U.S.C. § 6591b] is intended to operate within the provisions of NEPA,
not as an exception to NEPA.")

(*see* 36 C.F.R. § 220.6(b)(1)(i)), the California spotted owl, triggered the need for an analysis of "extraordinary circumstances," and the Forest Service was therefore required to examine the "cause-effect relationship" between the Sunny South Project and California spotted owls, and "the degree of the potential effect" to the species to determine whether extraordinary circumstances exist. 36 C.F.R. 220.6(b)(2). As part of the "extraordinary circumstances" analysis, the Forest Service must assess if "it is uncertain whether the proposed action may have a significant effect on the environment." 36 C.F.R. 220.6(c). If so, then the Forest Service must at least "prepare an EA." *Id*.

The Forest Service concluded that "extraordinary circumstances" do not exist as to the Sunny South Project even though the Project degrades important spotted owl habitat. ER 31-32. In *Southwest Ctr. for Biological Diversity v. United States Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996), this Circuit upheld the Forest Service's determination of an absence of "extraordinary circumstances" because the project at issue in that case would have "no effect" on the Mexican spotted owl. However, the Court explained that such determinations are valid when "the agency determines that the project *will not impact negatively* on the species." *Id*. (emphasis added).

Here, however, the Sunny South Project will unequivocally and admittedly impact negatively on the California spotted owl. Indeed, as discussed below, the

negative impacts are painfully apparent from the administrative record in this case, including from the Forest Service's own admissions.

The Sunny South Project intends to use a medium-intensity logging method called commercial thinning (ER 71) that greatly reduces the canopy cover of the logged forest, from as high as 86% canopy cover down to just 50% (see Table 10 at ER 72). Defendants themselves admit that "[t]hese [Core Area] treatments would reduce habitat suitability by reducing canopy cover to a minimum of 50 percent . . . ." (ER 31), and acknowledge that "substantial portions" of four of the five Core Areas will be logged. ER 72; *see also* ER 70 (Table 9, showing that 41%, 2%, 21%, 35%, and 76% of the five impacted HRCAs will be logged.)

The studies in the record that examine the relationship between medium-intensity logging and its impacts to California spotted owls find a profound negative impact from the logging due to its impacts to forest canopy cover in mature forest. *See, e.g.,* Tempel et al. 2014 at ER 137 ["The amount of forest with high (>70%) canopy cover dominated by medium- or large-sized trees was the most important predictor of variation in [California spotted owl] demographic rates."] This negative impact can be severe because it can result in one of three outcomes for the owls: death, displacement,[10] or lost reproductive capacity. As stated in Tempel et al. 2014 (ER 139): "[T]he most appropriate inference about

---

[10] Displacement results when, although the owls do not die, they leave their current territory because that territory can no longer support them.

the influence of medium-intensity harvesting practices is that they appear to reduce reproductive potential, and when implemented in forests with high canopy cover, are likely to reduce survival and territory occupancy as well."

While these potential impacts alone are alarming, they are of even greater significance because they will further hinder an already declining owl population (ER 62, noting a 50% population decline), and thus push the population closer to extinction. In other words, the "the degree of the potential effect" (*see* 36 C.F.R. 220.6(b)(2)) of the Sunny South Project on California spotted owls is quite serious because the Project not only negatively impacts the owls in the Project area, but also negatively impacts the California spotted owl population by contributing to its downward spiral towards extinction.

Also of great concern is the fact that not only are all five impacted Core Areas occupied by owls, those owls have recently shown the highest productivity possible with regard to owl reproduction. ER 70 (Table 8, showing the "Summary information for California spotted owl PACs and/or HRCAs within the analysis area," including their "Contribution to Productivity," and showing that the owls that will be impacted have the highest productivity possible, a "5".) Even the Forest Service notes: "[A]ll the territories that would be directly affected [have been] consistently occupied and frequently breed, contributing substantially to productivity." ER 70. Thus, in the absence of logging, the owls at issue here

49

would be helping the future well-being of the population via their reproductive success. ER 70, Table 8. The Sunny South logging, on the other hand, is likely to lead to lost reproductive capacity, thus diminishing the existing reproductive success and thereby causing great harm by contributing towards further population decline and possible extinction.

Defendants, in their Decision Memo, assert that "the Sunny South Project may affect individual owls, but is not likely to result in a trend toward federal listing or a loss of viability." ER 31. But clearly that is not a rational conclusion given the facts of the situation just described. Again, the California spotted owl is already in a steep 50% population decline, and the additional potential negative impacts from the Sunny South logging—such as lost reproductive capacity, death or displacement—will further contribute to that decline, thus likely resulting in a trend toward ESA listing or a loss of viability.

In their Decision Memo, Defendants try to sidestep the Project's negative impacts by asserting that "the project is expected to limit adverse short-term effects while improving long-term habitat, while reducing the risk of losing suitable habitat." ER 32. But the issue here is whether the Forest Service has rationally explained that the Project will not negatively impact the owls, and that there exists no "uncertain[y] whether the proposed action may have a significant effect on the environment . . . ." *See* 36 C.F.R. § 220.6(c). Regardless of any

50

purported benefits the Forest Service wishes to rely upon, there will likely be

negative impacts to the owls in the Project area and the overall owl population for

a number of decades—Defendants themselves admit that there will be adverse

effects, and their own documents acknowledge that the Project "*may reduce*

*habitat values for spotted owls for 20 to 50 years*." ER 75 (emphasis added).

Moreover, had an EA been prepared, and Plaintiffs provided the ability to

comment on the Forest Service's analysis and supporting documents, Plaintiffs

could have explained why the Forest Service's asserted benefits were incorrect or

unlikely to occur.  But because the Forest Service wrongly relied upon a

Categorical Exclusion, Plaintiffs were never given that opportunity.[11]

In light of the facts in the record demonstrating that the Sunny South

Project will likely "impact negatively on the species" (*Southwest Ctr. for*

*Biological Diversity.*, 100 F.3d at 1450), and will do so to a grave degree due to

the owls' declining status and the Project's potential impacts to owl survival and

reproduction, this Court should hold that Defendants' reliance on a Categorical

Exclusion was not rational.  Moreover, the facts here demonstrate that there is, at

the very least, uncertainty with respect to the potential for significant effects, and

that uncertainty therefore requires the preparation of an EA.

---

[11] Plaintiffs never had the opportunity to rebut the Forest Service's assertions
because (1) the scoping document does not even mention owls, let alone argue
benefits for them, and (2) Defendants' supporting documents were never made
available to the public for review/comment.

51

**D. Effective Relief Is Still Available**

Because the logging at issue for the Sunny South Project was not enjoined during the pendency of this case, the logging may be completed before a decision is issued. Plaintiffs therefore feel compelled to explain to the Court what relief would still be available to Plaintiffs.

As an initial matter, this case will clearly not become moot. Defendants bear a "heavy" burden to demonstrate mootness. *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1329 (9th Cir. 1992). If "there can be any effective relief," then the case is not moot. *Northwest Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244-45 (9th Cir. 1988). Here, effective relief is available to Plaintiffs.

First, this Court can order the Forest Service to conduct a NEPA analysis as to the 16 U.S.C. § 6591a(b)(2) treatment area designation process. Prior to completion of the required NEPA analysis, the Court could also enjoin the Forest Service from using 16 U.S.C. § 6591b's categorical exclusion process in California spotted owl habitat unless and until the Forest Service can demonstrate full compliance with NEPA.

Second, this Court can not only declare that the Forest Service's "extraordinary circumstances" analysis is arbitrary and capricious (which itself is important to Plaintiffs), this Court can also, for example, order the Forest Service to find out what actually happens to the affected California spotted owls over time

in the logged Sunny South Project area by ordering the Forest Service to monitor

the logged Core Areas and examine the Project's impacts to the owls so as to better

inform future Forest Service actions/projects.

These types of relief are well within what this Circuit has found appropriate

and necessary for legal violations like those at issue here.  In *Neighbors of Cuddy*

*Mountain v. Alexander*, 303 F.3d 1059 (9th Cir. 2002), this Circuit explained, in a

similar situation where the plaintiffs were denied an injunction with respect to

logging, that an action is moot only "where no effective relief for the alleged

violation can be given." *Id*. at 1065.  The *Neighbors* Court reasoned that when

plaintiffs request broadly "such further relief as may be necessary and appropriate .

. . ," the courts have leeway to address forms of relief that allow the case to remain

live. *Id.* at 1066.  The Court noted that "it could order the Forest Service to study

the sale's impacts on species viability, and, if necessary, to mitigate those impacts

in both the area of the sale and elsewhere in the forest," or "order the Forest

Service to adjust future timber plans to compensate . . . ." *Id*.  Similarly, in *Earth*

*Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147 (9th Cir. 2006), this Circuit

explained that effective relief could include "monitoring of the California spotted

owl . . . ." *Id.* at 1157-58, *abrogated on other grounds by Winter v. Natural Res.*

*Def. Council, Inc.,* 555 U.S. 7 (2008).  Consequently, the Court can still effectively

provide Plaintiffs relief, and thus the Court should reach the merits of this

important case.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court

reverse the August 16, 2017, Order of the District Court that granted the

Defendants' motion for summary judgment. The Court should declare that

Defendants are in violation of NEPA and remand to the District Court with

direction to grant Plaintiffs' motion for summary judgment.

Further, this Court should order the Forest Service to conduct a NEPA

analysis as to the 16 U.S.C. § 6591a(b)(2) treatment area designation for

California, and enjoin the Forest Service from using 16 U.S.C. § 6591b's

categorical exclusion process in California spotted owl habitat until the Forest

Service can demonstrate full compliance with NEPA. This Court should also

order the Forest Service to monitor the logged Core Areas in order to examine the

Project's impacts to the owls and better protect them in the future.


Respectfully submitted this 5th day of January, 2018,

*/s/ Justin Augustine*
_____
Justin Augustine
René P. Voss

*Attorneys for Plaintiffs-Appellants*

54

## STATEMENT OF RELATED CASE

Pursuant to Circuit Rule 28-2.6, counsel for Plaintiffs-Appellants certifies that to their knowledge no related case is pending in this Court.

Respectfully submitted this 5th day of January, 2018,

*/s/ Justin Augustine*

_____

Justin Augustine
René P. Voss

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

I certify that pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C) and Ninth Circuit Rule 32-1, the foregoing opening brief is proportionately spaced, has a typeface of 14 points, and contains 13,270 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

*/s/ Justin Augustine*

_____

Justin Augustine
René P. Voss

*Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2018, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Justin Augustine*

_____

Justin Augustine
René P. Voss

*Attorneys for Plaintiffs-Appellants*

**Form 8.** **Certificate of Compliance Pursuant to 9th Circuit Rules 28.1-1(f), 29-2(c)(2) and (3), 32-1, 32-2 or 32-4 for Case Number** <u>17-16760</u>

Note: This form must be signed by the attorney or unrepresented litigant *and attached to the end of the brief.*

I certify that (*check appropriate option*):

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 28.1-1.
The brief is ⬚ words or ⬚ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☒ This brief complies with the length limits permitted by Ninth Circuit Rule 32-1.
The brief is 13,270 words or ⬚ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 32-2(b).
The brief is ⬚ words or ⬚ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable, and is filed by (1) ☐ separately represented parties; (2) ☐ a party or parties filing a single brief in response to multiple briefs; or (3) ☐ a party or parties filing a single brief in response to a longer joint brief filed under Rule 32-2(b). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the longer length limit authorized by court order dated ⬚
The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6). The brief is ⬚ words or ⬚ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 32-2 (a) and is ⬚ words or ⬚ pages, excluding the portions exempted by Fed. R. App. P. 32 (f), if applicable. The brief's type size and type face comply with Fed. R .App. P. 32(a)(5) and (6).

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 29-2 (c)(2) or (3) and is ⬚ words or ⬚ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits set forth at Ninth Circuit Rule 32-4.
The brief is ⬚ words or ⬚ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Signature of Attorney or Unrepresented Litigant | /s/ Justin Augustine

Date | 1-5-2018

("s/" plus typed name is acceptable for electronically-filed documents)

*(Rev.12/1/16)*

# ATTACHMENT A:

## STATUTORY AND REGULATORY ADDENDUM*

## TABLE OF CONTENTS

### Statutes

5 U.S.C. § 706 ................................................................................2

15 U.S.C. § 793(c)(1) .......................................................................2

16 U.S.C. § 6501 ..............................................................................3

16 U.S.C. § 6514 ..............................................................................3

16 U.S.C. § 6591a ............................................................................6

16 U.S.C. § 6591b ............................................................................7

### Regulations

36 C.F.R. § 220.6(a)-(c) .................................................................10

40 C.F.R. § 1502.20 ........................................................................10

40 C.F.R. § 1508.4 ..........................................................................11

40 C.F.R. § 1508.8 ..........................................................................11

40 C.F.R. § 1508.18 ........................................................................12

_____

*Relevant provisions of each section or document are excerpted where possible.

## 5 U.S.C § 706

§ 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

(1)  compel agency action unlawfully withheld or unreasonably delayed; and

(2)  hold unlawful and set aside agency action, findings, and conclusions found to be--

(A)  arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B)  contrary to constitutional right, power, privilege, or immunity;

(C)  in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D)  without observance of procedure required by law;

(E)  unsupported by substantial evidence in a case subject to sections 556 and 557 of this title [5 USCS §§ 556 and 557] or otherwise reviewed on the record of an agency hearing provided by statute; or

(F)  unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## 15 U.S.C. § 793(c)(1)

§ 793. Protection of public health and environment

***

(c) Major Federal actions significantly affecting the quality of the human environment.

(1)  No action taken under the Clean Air Act shall be deemed a major Federal action significantly affecting the quality of the human environment within the meaning of the National Environmental Policy Act of 1969 (83 Stat. 856) [42 USCS §§ 4321 et seq.].

## 16 U.S.C. § 6501

§ 6501. Purposes

The purposes of this Act are--
> (1) to reduce wildfire risk to communities, municipal water supplies, and other at-risk Federal land through a collaborative process of planning, prioritizing, and implementing hazardous fuel reduction projects;
> (2) to authorize grant programs to improve the commercial value of forest biomass (that otherwise contributes to the risk of catastrophic fire or insect or disease infestation) for producing electric energy, useful heat, transportation fuel, and petroleum-based product substitutes, and for other commercial purposes;
> (3) to enhance efforts to protect watersheds and address threats to forest and rangeland health, including catastrophic wildfire, across the landscape;
> (4) to promote systematic gathering of information to address the impact of insect and disease infestations and other damaging agents on forest and rangeland health;
> (5) to improve the capacity to detect insect and disease infestations at an early stage, particularly with respect to hardwood forests; and
> (6) to protect, restore, and enhance forest ecosystem components--
>> (A) to promote the recovery of threatened and endangered species;
>> (B) to improve biological diversity; and
>> (C) to enhance productivity and carbon sequestration.

## 16 U.S.C. § 6514

§ 6514. Environmental analysis

(a) Authorized hazardous fuel reduction projects. Except as otherwise provided in this title [16 USCS §§ 6511 et seq.], the Secretary shall conduct authorized hazardous fuel reduction projects in accordance with--
> (1) the National Environmental Policy Act of 1969 (42 U.S.C. 4331 et seq.); and
> (2) other applicable laws.

(b) Environmental assessment or environmental impact statement. The Secretary shall prepare an environmental assessment or an environmental impact statement pursuant to section 102(2) of the National Environmental Policy Act of 1969 (42 U.S.C. 4332(2)) for each authorized hazardous fuel reduction project.

(c) Consideration of alternatives.

    (1) In general. Except as provided in subsection (d), in the environmental assessment or environmental impact statement prepared under subsection (b), the Secretary shall study, develop, and describe--

        (A) the proposed agency action;

        (B) the alternative of no action; and

        (C) an additional action alternative, if the additional alternative--

            (i) is proposed during scoping or the collaborative process under subsection (f); and

            (ii) meets the purpose and need of the project, in accordance with regulations promulgated by the Council on Environmental Quality.

    (2) Multiple additional alternatives. If more than 1 additional alternative is proposed under paragraph (1)(C), the Secretary shall--

        (A) select which additional alternative to consider, which is a choice that is in the sole discretion of the Secretary; and

        (B) provide a written record describing the reasons for the selection.

(d) Alternative analysis process for projects in wildland-urban interface.

    (1) Proposed agency action and 1 action alternative. For an authorized hazardous fuel reduction project that is proposed to be conducted in the wildland-urban interface, the Secretary is not required to study, develop, or describe more than the proposed agency action and 1 action alternative in the environmental assessment or environmental impact statement prepared pursuant to section 102(2) of the National Environmental Policy Act of 1969 (42 U.S.C. 4332(2)).

    (2) Proposed agency action. Notwithstanding paragraph (1), but subject to paragraph (3), if an authorized hazardous fuel reduction project proposed to be conducted in the wildland-urban interface is located no further than 1 1/2 miles from the boundary of an at-risk community, the Secretary is not required to study, develop, or describe any alternative to the proposed agency action in the environmental assessment or environmental impact statement prepared pursuant to section 102(2) of the National Environmental Policy Act of 1969 (42 U.S.C. 4332(2)).

    (3) Proposed agency action and community wildfire protection plan alternative. In the case of an authorized hazardous fuel reduction project described in paragraph (2), if the at-risk community has adopted a community wildfire protection plan and the proposed agency action does not implement the recommendations in the plan regarding the general location and basic method of treatments, the Secretary shall evaluate the recommendations in the plan as an alternative to the proposed agency action

in the environmental assessment or environmental impact statement prepared pursuant to section 102(2) of the National Environmental Policy Act of 1969 (42 U.S.C. 4332(2)).

(e)  Public notice and meeting.

    (1)  Public notice. The Secretary shall provide notice of each authorized hazardous fuel reduction project in accordance with applicable regulations and administrative guidelines.

    (2)  Public meeting. During the preparation stage of each authorized hazardous fuel reduction project, the Secretary shall--

        (A)  conduct a public meeting at an appropriate location proximate to the administrative unit of the Federal land on which the authorized hazardous fuel reduction project will be conducted; and

        (B)  provide advance notice of the location, date, and time of the meeting.

(f)  Public collaboration. In order to encourage meaningful public participation during preparation of authorized hazardous fuel reduction projects, the Secretary shall facilitate collaboration among State and local governments and Indian tribes, and participation of interested persons, during the preparation of each authorized fuel reduction project in a manner consistent with the Implementation Plan.

(g)  Environmental analysis and public comment. In accordance with section 102(2) of the National Environmental Policy Act of 1969 (42 U.S.C. 4332(2)) and the applicable regulations and administrative guidelines, the Secretary shall provide an opportunity for public comment during the preparation of any environmental assessment or environmental impact statement for an authorized hazardous fuel reduction project.

(h)  Decision document. The Secretary shall sign a decision document for authorized hazardous fuel reduction projects and provide notice of the final agency actions.

# 16 U.S.C. § 6591a

§ 6591a. Designation of treatment areas

(a)  Definition of declining forest health. In this section, the term "declining forest health" means a forest that is experiencing--

    (1)  substantially increased tree mortality due to insect or disease infestation; or

    (2)  dieback due to infestation or defoliation by insects or disease.

(b)  Designation of treatment areas.

    (1)  Initial areas. Not later than 60 days after the date of enactment of the Agricultural Act of 2014 [enacted Feb. 7, 2014], the Secretary shall, if requested by the Governor of the State, designate as part of an insect and disease treatment program 1 or more landscape-scale areas, such as subwatersheds (sixth-level hydrologic units, according to the System of Hydrologic Unit Codes of the United States Geological Survey), in at least 1 national forest in each State that is experiencing an insect or disease epidemic.

    (2)  Additional areas. After the end of the 60-day period described in paragraph (1), the Secretary may designate additional landscape-scale areas under this section as needed to address insect or disease threats.

(c)  Requirements. To be designated a landscape-scale area under subsection (b), the area shall be--

    (1)  experiencing declining forest health, based on annual forest health surveys conducted by the Secretary;

    (2)  at risk of experiencing substantially increased tree mortality over the next 15 years due to insect or disease infestation, based on the most recent National Insect and Disease Risk Map published by the Forest Service; or

    (3)  in an area in which the risk of hazard trees poses an imminent risk to public infrastructure, health, or safety.

(d)  Treatment of areas.

    (1)  In general. The Secretary may carry out priority projects on Federal land in the areas designated under subsection (b) to reduce the risk or extent of, or increase the resilience to, insect or disease infestation in the areas.

    (2)  Authority. Any project under paragraph (1) for which a public notice to initiate scoping is issued on or before September 30, 2018, may be carried out in accordance with subsections (b), (c), and (d) of section 102 [16 USCS § 6512], and sections 104, 105, and 106 [16 USCS §§ 6514, 6515, and 6516].

(3)  Effect. Projects carried out under this subsection shall be considered authorized hazardous fuel reduction projects for purposes of the authorities described in paragraph (2).

(4)  Report.

    (A)  In general. In accordance with the schedule described in subparagraph (B), the Secretary shall issue 2 reports on actions taken to carry out this subsection, including--

        (i)  an evaluation of the progress towards project goals; and

        (ii)  recommendations for modifications to the projects and management treatments.

    (B)  Schedule. The Secretary shall--

        (i)  not earlier than September 30, 2018, issue the initial report under subparagraph (A); and

        (ii)  not earlier than September 30, 2024, issue the second report under that subparagraph.

(e)  Tree retention. The Secretary shall carry out projects under subsection (d) in a manner that maximizes the retention of old-growth and large trees, as appropriate for the forest type, to the extent that the trees promote stands that are resilient to insects and disease.

(f)  Authorization of appropriations. There is authorized to be appropriated to carry out this section $ 200,000,000 for each of fiscal years 2014 through 2024.

## 16 U.S.C. § 6591b

§ 6591b. Administrative review

(a)  In general. Except as provided in subsection (d), a project described in subsection (b) that is conducted in accordance with section 602(d) [16 USCS § 6591a(d)] may be--

    (1)  considered an action categorically excluded from the requirements of Public Law 91-190 (42 U.S.C. 4321 et seq.); and

    (2)  exempt from the special administrative review process under section 105 [16 USCS § 6515].

(b)  Collaborative restoration project.

    (1)  In general. A project referred to in subsection (a) is a project to carry out forest restoration treatments that--

        (A)  maximizes the retention of old-growth and large trees, as appropriate for the forest type, to the extent that the trees promote stands that are resilient to insects and disease;

Statutory and Regulatory Addendum Page 7

(B)  considers the best available scientific information to maintain or restore the ecological integrity, including maintaining or restoring structure, function, composition, and connectivity; and

(C)  is developed and implemented through a collaborative process that—

    (i)  includes multiple interested persons representing diverse interests; and

    (ii)

        (I)  is transparent and nonexclusive; or

        (II)  meets the requirements for a resource advisory committee under subsections (c) through (f) of section 205 of the Secure Rural Schools and Community Self-Determination Act of 2000 (16 U.S.C. 7125).

(2)  Inclusion. A project under this subsection may carry out part of a proposal that complies with the eligibility requirements of the Collaborative Forest Landscape Restoration Program under section 4003(b) of the Omnibus Public Land Management Act of 2009 (16 U.S.C. 7303(b)).

(c)  Limitations.

    (1)  Project size. A project under this section may not exceed 3000 acres.

    (2)  Location. A project under this section shall be limited to areas--

        (A)  in the wildland-urban interface; or

        (B)  Condition Classes 2 or 3 in Fire Regime Groups I, II, or III, outside the wildland-urban interface.

    (3)  Roads.

        (A)  Permanent roads.

            (i)  Prohibition on establishment. A project under this section shall not include the establishment of permanent roads.

            (ii)  Existing roads. The Secretary may carry out necessary maintenance and repairs on existing permanent roads for the purposes of this section.

        (B)  Temporary roads. The Secretary shall decommission any temporary road constructed under a project under this section not later than 3 years after the date on which the project is completed.

(d)  Exclusions. This section does not apply to--

    (1)  a component of the National Wilderness Preservation System;

    (2)  any Federal land on which, by Act of Congress or Presidential proclamation, the removal of vegetation is restricted or prohibited;

    (3)  a congressionally designated wilderness study area; or

    (4)  an area in which activities under subsection (a) would be inconsistent with the applicable land and resource management plan.

(e) Forest management plans. All projects and activities carried out under this section shall be consistent with the land and resource management plan established under section 6 of the Forest and Rangeland Renewable Resources Planning Act of 1974 (16 U.S.C. 1604) for the unit of the National Forest System containing the projects and activities.

(f) Public notice and scoping. The Secretary shall conduct public notice and scoping for any project or action proposed in accordance with this section.

(g) Accountability.

> (1) In general. The Secretary shall prepare an annual report on the use of categorical exclusions under this section that includes a description of all acres (or other appropriate unit) treated through projects carried out under this section.

> (2) Submission. Not later than 1 year after the date of enactment of this section [enacted Feb. 7, 2014], and each year thereafter, the Secretary shall submit the reports required under paragraph (1) to--

>> (A) the Committee on Agriculture, Nutrition, and Forestry of the Senate;

>> (B) the Committee on Environment and Public Works of the Senate;

>> (C) the Committee on Agriculture of the House of Representatives;

>> (D) the Committee on Natural Resources of the House of Representatives; and

>> (E) the Government Accountability Office.

## 36 C.F.R. § 220.6(a)-(c)

§ 220.6 Categorical exclusions.

(a) General. A proposed action may be categorically excluded from further analysis and documentation in an EIS or EA only if there are no extraordinary circumstances related to the proposed action and if:

    (1) The proposed action is within one of the categories established by the Secretary at 7 CFR part 1b.3; or

    (2) The proposed action is within a category listed in § 220.6(d) and (e).

(b) Resource conditions. (1) Resource conditions that should be considered in determining whether extraordinary circumstances related to a proposed action warrant further analysis and documentation in an EA or an EIS are:

    (i) Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species;

(c) Scoping. If the responsible official determines, based on scoping, that it is uncertain whether the proposed action may have a significant effect on the environment, prepare an EA. If the responsible official determines, based on scoping, that the proposed action may have a significant environmental effect, prepare an EIS.

\*\*\*

## 40 C.F.R. § 1502.20

§ 1502.20 Tiering.

Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review ( § 1508.28). Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action. The subsequent document shall state where the earlier document is available. Tiering may also be appropriate for different stages of actions. (Section 1508.28).

## 40 C.F.R. § 1508.4

§ 1508.4 Categorical exclusion.

"Categorical exclusion" means a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations (§ 1507.3) and for which, therefore, neither an environmental assessment nor an environmental impact statement is required. An agency may decide in its procedures or otherwise, to prepare environmental assessments for the reasons stated in § 1508.9 even though it is not required to do so. Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect.

## 40 C.F.R. § 1508.8

§ 1508.8 Effects.

"Effects" include:
> (a) Direct effects, which are caused by the action and occur at the same time and place.
> (b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

## 40 C.F.R. § 1508.18

§ 1508.18 Major Federal action.

"Major Federal action" includes actions with effects that may be major and which are potentially subject to Federal control and responsibility. Major reinforces but does not have a meaning independent of significantly (§ 1508.27). Actions include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the Administrative Procedure Act or other applicable law as agency action.

    (a) Actions include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals (§§ 1506.8, 1508.17). Actions do not include funding assistance solely in the form of general revenue sharing funds, distributed under the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. 1221 et seq., with no Federal agency control over the subsequent use of such funds. Actions do not include bringing judicial or administrative civil or criminal enforcement actions.

    (b) Federal actions tend to fall within one of the following categories:

        (1) Adoption of official policy, such as rules, regulations, and interpretations adopted pursuant to the Administrative Procedure Act, 5 U.S.C. 551 et seq.; treaties and international conventions or agreements; formal documents establishing an agency's policies which will result in or substantially alter agency programs.

        (2) Adoption of formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of Federal resources, upon which future agency actions will be based.

        (3) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

        (4) Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities.